237 F.2d 7
 LEADER CLOTHING COMPANY, Inc., a corporation, Appellant,
v.
The FIDELITY AND CASUALTY COMPANY OF NEW YORK, a corporation, Appellee.
The FIDELITY AND CASUALTY COMPANY OF NEW YORK, a corporation, Cross-Appellant,
v.
LEADER CLOTHING COMPANY, Inc., a corporation, Cross-Appellee.
 No. 5180.
 No. 5181.
 United States Court of Appeals Tenth Circuit.
 August 3, 1956.
 Rehearing Denied October 31, 1956.
 
 John E. Shamberg, Kansas City, Kan. (Joseph Cohen, Charles S. Schnider, Thomas E. Joyce and Joseph P. Jenkins, Kansas City, Kan., were with him on the brief), for appellant and cross-appellee.
 Tom J. Stubbs, Kansas City, Mo. (Willard L. Phillips, McAnany, Van Cleave & Phillips, Kansas City, Kan., and Stubbs, McKenzie, Williams & Merrick, Kansas City, Mo., were with him on the brief), for appellee and cross-appellant.
 Before HUXMAN, MURRAH and PICKETT, Circuit Judges.
 HUXMAN, Circuit Judge.
 
 
 1
 The action out of which these two appeals arose was filed in the State District Court of Wyandotte County, Kansas, and was removed to the Federal Court. Recovery was sought on an insurance policy denominated Blanket Position Bond.
 
 
 2
 The facts necessary to consider are substantially as follows. The Leader Clothing Company[1] is a large mercantile establishment, doing business in Kansas City, Kansas, and having affiliated stores in other cities. For the period of April 1, 1949, through March 31, 1950, it and its affiliates purchased from the Fidelity and Casualty Company of New York[2] the policy in question. In the policy the company agreed to indemnify Leader against loss of money or property resulting from fraud or dishonesty of any of its employees, limiting the amount of loss from any one employee to $15,000. It was discovered that two porters, Ralph V. Baylis and Grady Leath, were stealing, removing and selling merchandise consisting of clothing and wearing apparel belonging to Leader. Leader claimed that the two porters had separately and not in concert stolen merchandise of the value of $24,861.06. Demand for this amount being refused, this action was instituted to recover such sum.
 
 
 3
 The case was referred to a Master to take evidence, make findings of fact and report to the court. Extensive hearings were held and a great amount of testimony was taken by the Master. He found and reported that Ralph V. Baylis had defrauded Leader of $9,728.24 and that Leath had defrauded Leader of more than $15,000. Since recovery as to any one employee was limited to $15,000, the Master found and recommended that Leader recover that sum because of the fraud of Leath and the further sum of $9,728.24 because of the defalcation of Baylis. He recommended that Leader have judgment against Fidelity in the total sum of $24,728.24.
 
 
 4
 The trial court considered the report and recommitted the case to the Master for further consideration with respect to certain phases of the case. Further testimony was taken and the Master filed a supplemental report re-adopting his former findings and again recommending that Leader have judgment for $24,827.24.
 
 
 5
 The court gave serious consideration to the Master's report, rejected certain portions thereof, modified other portions thereof and concluded that Leader was entitled to judgment for $10,000. Leader has appealed from the judgment of the court reducing the amount of recovery to $10,000, and Fidelity has appealed from the judgment for $10,000.
 
 
 6
 The trial court wrote an extensive memorandum in the nature of an opinion. It recognized that where a master is appointed under Fed.Rules Civ.Proc. rule 53(e), 28 U.S.C.A., the court should not disturb his findings merely because of a difference of opinion, but concluded that it was vested not only with a discretion but also with the duty to review and modify them if upon the entire record it was of the view that they were clearly erroneous. The court's rulings and reasons for the modifications it made will be discussed as they become relevant in considering the various assignments of error urged for reversal.
 
 
 7
 In the main the two appeals present identical questions. The principal contention of Fidelity is there is no evidence sufficient to support any judgment against it. Leader on the other hand contends that the evidence clearly supports the Master's findings and that the court erred in modifying such findings. Since the questions raised by the appeal and cross-appeal are interrelated, the cases will be discussed without specific reference to either appeal.
 
 
 8
 Fidelity contends that Leader did not meet the burden of proof which the policy placed upon it to entitle it to recover. Section 5 of the policy so far as material provides that in the case of inventory loss the insured must "conclusively" establish that the loss was in fact due to the fraud or dishonesty of the employee. Leader takes the position that this language simply meant that the insured must prove such loss by a reasonable preponderance of the evidence, while Fidelity contends that it requires Leader to prove the loss by a "high degree of certainty." The court held that Section 5 required Leader to prove the loss by "clear, cogent and convincing evidence."
 
 
 9
 Fidelity would have us adopt a burden of proof rule even greater than is required in a criminal case where the Government is required to prove a defendant guilty only beyond a reasonable doubt. No case is cited to support such a strict rule. A number of cases have considered similar or identical language in insurance policies. None have adopted the burden of proof rule contended for by Fidelity. In Sowden v. United States Fidelity & Guaranty Co., 122 Kan. 375, 252 P. 208, 209, the Kansas Court said, "It is well established that, even where a policy insuring against theft requires that the proof of the larceny shall be `direct and affirmative,' or even `conclusive,' circumstantial evidence may be sufficient." Couch's Encyclopedia of Insurance, Vol. 8, § 2241, states "* * * it seems that even under policies requiring direct and affirmative evidence of the burglary, larceny or theft, the courts refuse to construe the term `direct and affirmative' or `conclusive' evidence in its strict, technical sense, as to do so would render the policy valueless except in the most unusual cases * * *."[3] It is not necessary to determine whether the court required too strict a rule of proof. The question with respect to the sufficiency of the evidence to sustain a judgment for Leader will be determined by the rule adopted by the trial court.
 
 
 10
 Fidelity contends that Leader failed to prove conclusively or even by a preponderance of the evidence that it sustained an inventory loss; or that such inventory loss as it may have suffered, if any, was $10,000 or any other specified amount; or that such loss as it did suffer was due to employee dishonesty. With these contentions we cannot agree.
 
 
 11
 The transcript of the evidence taken by the Master consists of more than 900 pages, and the abstract thereof filed in this court consists of more than 400 pages. Much of this evidence consists of testimony of accountants, of their work in checking the books, of compilations and exhibits made by them, showing the conclusions reached by them from an examination of the records. It would be impossible to summarize the evidence, to say nothing of setting it out in detail, which leads us to conclude that the Master's finding, concurred in by the trial judge, that a very substantial loss had occurred from thefts committed by the two porters has been established.
 
 
 12
 Aside from the audit by Leader which showed a substantial loss, it employed a certified public accountant to make a complete check of the books for the entire period in question. From his work the certified public accountant concluded that Leader had suffered a loss of between $20,298.19 and $27,510.91, as a result of thefts by these two employees. From his independent inventory check he established a unit loss. In reaching his conclusions as to the monetary loss he considered three methods. First, the costing out method, involving totaling all the sales in the different categories at the actual sales invoice price and then adding to those actual sales invoice prices the markdowns noted on the sales invoices and then he computed the cost of sales at the store's normal markup of 40%. By the use of this method, the accountant arrived at a total loss of $27,510.91. By use of the second method, the accountant arrived at costs by taking the starting inventory, adding thereto purchases less the purchase returns and the transfers less the transfer returns, thus arriving at the merchandise available in dollars and cents and then dividing that dollars and cents figure by the units so arrived at, which gave the average cost of the garments, and then he multiplied the number of units short by that average cost. By the use of this method, the accountant arrived at a loss of $20,298.19. The third method, the gross profit method, compared gross profit percentages as indicated by federal income tax returns of the company for the years ending March 31, 1949, and March 31, 1950, the latter being the year in which the shortages occurred. By the use of this method, the accountant arrived at a loss for the year in question of $24,764.35, a 2.95% drop in gross profit from the previous year. It was from the use of these three methods that the accountant testified as to the estimated loss resulting from these thefts. Fidelity takes issue with these methods and their accuracy, and contends no reasonable accuracy, much less "conclusive" proof which it seeks to demand of Leader, has been established.
 
 
 13
 We are satisfied that the finding of the Master, concurred in by the trial court, that a substantial loss resulted from the thefts by the two porters is amply supported by the record. Indeed, Fidelity's auditor who made only a spot check of the books established that a loss had occurred. The court was critical of the comparison of the gross profits method in part employed by Leader's certified public accountant. This method was only one factor given consideration by the certified public accountant in determining the loss. It was established that there were no abnormal conditions during the period in question; that there were no extraordinary sales; that the method of operating the store was the same as during the preceding or succeeding periods considered by the certified public accountant. We cannot say that giving this method some consideration together with the other two methods under all the circumstances of the case invalidates the accountant's finding as to the amount of loss resulting from these thefts.
 
 
 14
 When it is once established with certainty that a loss covered by the policy has occurred, it is not necessary to a recovery that the amount must be proved with mathematical accuracy, where that is impossible. Where, as here, the amount of damages is difficult of ascertainment, as said by the Supreme Court, it would be a perversion of justice to deny all relief to the injured person under such circumstances. It is enough if there is a basis for a reasonable inference as to the extent of the damages.[4]
 
 
 15
 We think the record sustains the Master's finding that a loss of at least $24,827.24 occurred and that the trial court erred in entering judgment for only $10,000. It is the general rule that where a Master has been appointed under Rule 53(e) his findings should not be disturbed merely because the trial court is of a different opinion or dissatisfied with the Master's findings. The rule itself specifically provides that "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous." We did say in H. F. Wilcox Oil & Gas Co. v. Diffie, 10 Cir., 186 F.2d 683, that a finding was clearly erroneous when, although there was evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake had been committed, and in that case we did set aside the findings of the Master approved by the trial court. But we set out in great detail all the evidence showing that such findings were clearly erroneous. This was not done by the trial court here. After finding that a substantial loss had occurred, the trial court merely stated that in its opinion judgment should be entered for $10,000. No evidence was alluded to and no analysis of the evidence was attempted which would support such a conclusion. Under these circumstances we conclude that the trial court erred in setting aside the Master's finding as to the amount of damages and entering judgment for $10,000.
 
 
 16
 It does not, however, follow from what has been said that Leader is entitled to judgment for $24,728.24. To entitle Leader to the sum of $24,728.24 which the Master found that the two employees stole, it was necessary for it to further show how much Leath stole and how much Baylis stole, because the policy expressly limited liability to $15,000 for loss occasioned by any one employee. The Master found that Baylis stole $9,728.24 worth of merchandise and that Leath stole $15,000 worth of merchandise.[5] The Master reached these conclusions from the fact that Leath was in charge of the second floor where the shortage was $15,000, and Baylis was in charge of the first floor where the shortage was $9,728.24. It is conceded that Leath had unrestricted access to the first floor and Baylis had like access to the second floor. Under these facts it is as reasonable to assume that Baylis stole from the second floor as that Leath stole from the first floor. Certainly, the inference is not compelling that when Baylis, a confessed thief, went to the second floor he turned into an honest man, and Leath did likewise when he left the second floor and went down to the first floor. As stated, when once it is established that a loss has occurred equity and justice will, if necessary, lighten the burden of proof resting on the wronged person to establish the exact amount of the loss. By like considerations, when the insured seeks to recover double the maximum amount of coverage because of independent thefts by two employees the law will require him to establish by clear and convincing evidence the amount which was stolen by each of the two faithless employees. In our opinion Leader failed to sustain this burden. We are not unmindful of Baylis' testimony that he did not steal from the second floor. But this uncorroborated statement by a confessed thief, who had ample opportunity to steal from the second floor as well as from the first floor, is in our opinion insufficient to discharge the burden of proof resting on Leader to entitle it to recover more than $15,000.
 
 
 17
 A final contention by Leader is that the court erred in disallowing interest from April 26, 1950, the date on which proof of loss was served on Fidelity. The question of liability for interest is to be determined by the law of the state where the contract was made and is to be performed.[6] While it does not appear in the record where this contract was executed it covered an operation in Kansas and apparently was to be performed in that State. Both parties in their brief rely upon Kansas authorities to sustain their respective contentions as to interest. We will, therefore, proceed on the assumption that Kansas law controls.
 
 
 18
 Kansas G.S.1949, § 16-201 in part provides: "Legal rate. Creditors shall be allowed to receive interest at the rate of six percent per annum when no other rate of interest is agreed upon, for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the same and ascertaining the balance * * for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts * *." As we said in Southern Painting Co. v. United States, 10 Cir., 222 F.2d 431, 434, "Kansas has consistently held that interest is not recoverable on unliquidated claims until the amount due has been ascertained."[7] It is our conclusion from a review of the facts of this case that this case involved an unliquidated claim and that it, therefore, would be inequitable to exact interest other than from the date of the judgment. Assuming that from the beginning there were sufficient facts to show that thefts had occurred which would impose liability, the amount thereof was very much in dispute. The amount of inventory shortage resulting from these thefts was a hotly contested issue. This was not a case where a mathematical formula or a yardstick, so to speak, could be employed from which the answer would follow. Certified public accountants spent a great deal of time analyzing the books and records of Leader to determine the amount of inventory shortage attributable to these thefts and in the end they could not agree as to the amount of loss for which there was liability under the policy. This was not a case for the application of the maxim "That is certain which can be made certain." As observed by us in the Southern Painting Co. case, supra, interest may be imposed under the Kansas law where unliquidated claims are involved "where there has been unreasonable and vexatious delay in the `settlement of accounts.'" The record does not establish that such was the case here. Indeed, Leader makes no such contention in its brief.
 
 
 19
 The contention is made that the court erred in excluding Leath's statement from the record but in view of what has been said above we do not deem it necessary to pass upon this question.
 
 
 20
 The judgment is reversed and the cause is remanded with directions to proceed in conformity with the views expressed herein.
 
 
 
 Notes:
 
 
 [1]
 Herein called Leader
 
 
 [2]
 Herein called Fidelity
 
 
 [3]
 See also 169 A.L.R. 228; Kroloff v. Southern Surety Co., 197 Iowa 1244, 198 N.W. 629
 
 
 [4]
 Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; See also Kobe, Inc. v. Dempsey Pump Co., 10 Cir., 198 F.2d 416; Stern v. Dunlap Co., 10 Cir., 228 F.2d 939
 
 
 [5]
 The Master found that Leath stole more than $15,000 but because of the policy limitation only $15,000 need be considered
 
 
 [6]
 Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206; Southern Painting Co. v. United States, 10 Cir., 222 F.2d 431
 
 
 [7]
 For Kansas cases, see Winfield Mortgage & Trust Co. v. Robinson, 89 Kan. 842, 132 P. 979; People's Exchange Bank of Elmdale v. Miller, 139 Kan. 3, 29 P.2d 1079; Columbian Fuel Corp. v. Panhandle Eastern Pipe Line Co., 176 Kan. 433, 271 P.2d 773